331 F.2d 712
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, and International Longshoremen's Association, Local 1694, AFL-CIO, including James T. Moock and Clifford Carter, Respondents.
 No. 14480.
 United States Court of Appeals Third Circuit.
 Argued December 3, 1963.
 Decided May 14, 1964.
 
 Stephen Goldberg, N.L.R.B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin J. Welles, Attys., National Labor Relations Bd., on the brief), for petitioner.
 Abraham E. Freedman, Philadelphia, for respondents.
 Before STALEY, GANEY and SMITH, Circuit Judges.
 GANEY, Circuit Judge.
 
 
 1
 This matter is before the Court upon petition of the National Labor Relations Board for enforcement of its order. It arose out of charges brought by the Board of Harbor Commissioners of Wilmington, Delaware, against the International Longshoremen's Association, AFLCIO ("ILA"), its affiliated Local 1694, and two of ILA's officers, alleging that they unlawfully induced employees of Murphy, Cooke & Co. ("Murphy"), a stevedoring concern, not to remove a cargo of frozen meat from a vessel docked at the Marine Terminal in Wilmington. The ILA and Local 1694 claimed the right on behalf of employees of Murphy to do the necessary handling of the cargo until it was placed at the freezer door of Transit Freeze Corporation, consignee of the meat. The Board found that respondents had committed unfair labor practices within the meaning of § 8(b) (4) (B) of the Labor Management Relations Act, 29 U.S.C.A. § 158(b) (4) (B), by inducing employees of Murphy to engage in a strike with an object of forcing or requiring Murphy and Norton, Lilly & Co., Inc., ("Norton"), a shipping agent, to cease doing business with other persons, and also within the meaning of § 8(b) (4) (A) of the Act by forcing or requiring Murphy "to enter into" an agreement which is prohibited by § 8(e) of the Act. International Longshoremen's Association, AFL-CIO, et al., 137 N.L.R.B. 1178 (1962).
 
 
 2
 The Marine Terminal in Wilmington, Delaware, is maintained and operated by the Board of Harbor Commissioners, a political subdivision of Wilmington.[1] The Commissioners had a collective bargaining agreement with Highway Truck Drivers & Helpers, Local 107 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. They therefore hired employees represented by locals affiliated with the Teamsters Union. Transit Freeze Corporation leased a portion of the pier space from the Commissioners for the purpose of building a freezing compartment for the storage of fresh and frozen foods. One of the provisions of the lease states in part: "* * * charges for all services which may be rendered by Lessor to the Lessee other than those specified hereinabove, shall be as is specified in the presently effective publication designated as `Tariff No. 13' of the Wilmington Marine Terminal or as may be specified in any amendment thereof or Supplement thereto."[2]
 
 
 3
 Transit orally agreed to have the Commissioner hire all labor, when necessary, on a cost plus fifteen percent basis, for services incident to the handling and transporting of food stuff on the terminal to and from its freezer compartment. Around August 15, 1960, the freezer compartment of Transit Freeze was ready for use.
 
 
 4
 The first frozen cargo of meat destined for Transit Freeze was scheduled to arrive on the S.S. Pipiriki in August of 1960. Before meat may be brought into the United States, it must pass inspection by inspectors of the Department of Agriculture. For this purpose containers of meat must be placed at a convenient place on the dock or pier, the containers opened, the meat inspected, and if found to be fit, graded and stamped, and then repackaged. Thereafter, the containers are placed at a location on the dock or pier where they may be picked up by the consignee. If the meat is to be stored, the containers must be transported to the storage place. The process of opening and reclosing the containers is known as "coopering". The vessel owner employed Norton as shoreside agent for the vessel. Norton, in turn, made arrangements with the Commissioners for docking the vessel at the Wilmington Marine Terminal according to the rates, terms and conditions of Tariff No. 13.[3] It also contracted with Murphy to unload the cargo of the vessel. Both Norton and Murphy are members of the Philadelphia Marine Trade Association ("PMTA") an association of some 72 employers, consisting of steamship companies, steamship agents, terminal operators, stevedoring companies, ship repair and cleaning companies, ship carpenters and other related organizations concerned with servicing vessels and piers on the waterfront of the Delaware River within the geographical area of the Port of Philadelphia. PMTA has a collective bargaining agreement with ILA effective from October 1, 1959 to September 30, 1962. It has also entered into similar agreements with a number of local unions affiliated with ILA. One of these, dated December 23, 1959, and designated "Longshoremen's Agreement" was entered into with Locals 1290, 1291, 1332 and 1694 which represent longshoremen. The preamble of this agreement, in pertinent part, provides:
 
 
 5
 "THIS AGREEMENT * * * covers the work pertaining to the rigging of ships, loading and unloading of all cargoes, including mail, ships' stores and baggage, in the Port of Philadelphia and Vicinity, including all points on the Delaware River from Trenton, New Jersey, to Artificial Island, inclusive.[4]
 
 
 6
 "The Employer-Members of the Association agree that they will not directly perform work done on a pier or terminal or contract out such work which historically and regularly has been and currently is performed by employees covered by this agreement or employees covered by I.L.A. craft agreements unless such work on such pier or terminal is performed by employees covered by I.L. A. agreements."
 
 
 7
 The S.S. Pipiriki docked on August 22, 1960, with a cargo of meat at the Wilmington Marine Terminal ready to be unloaded. During a meeting on the previous day at which representatives of ILA, Local 1694, the Commissioners, Local 107 (Teamsters), Transit Freeze, and Murphy were in attendance, ILA and Local 1694 were told by the superintendent of the Terminal that the employees represented by ILA were not entitled to the work in question. In response, James T. Moock, vice-president of ILA, said that he was not going to permit the vessel to be unloaded unless ILA members got that work.[5] Moock also insisted that Murphy live up to the PMTA-Local 1694 agreement which, according to him, called for Murphy to do the necessary work of handling the meat from shipside to freezer door. Thereafter, the employees of Murphy, without Murphy's consent, refused to unload the vessel until a restraining order was issued against respondents by the United States District Court for the District of Delaware on August 27, 1960, pursuant to § 10(l) of the Act. Samoff for and on Behalf of N. L. R. B. v. International Longshoremen's Association, Local 1694, et al., 188 F.Supp. 308. The employees of Murphy did the unloading, and employees hired by or through the Commissioners did the coopering and the transporting of the meat shipside to the door of Transit Freeze.[6] After a hearing before the National Labor Relations Board, that Board made findings of fact and conclusions of law and issued an order requiring respondents to cease and desist from conduct found by the Board to be unfair labor practices.
 
 I.
 
 8
 Respondents do not seriously deny that they induced or encouraged employees of Murphy to engage in a strike or that their activity fell within clauses (i) and (ii) of § 8(b) (4). Instead they defend their actions on the asserted ground that such employees have a right to strike for the purpose of requiring their employer to adhere to the provisions of a collective bargaining agreement which forbids the employer from performing or contracting out work done on a pier or terminal unless such work is performed by employees covered by ILA agreements, where the work has been historically and regularly performed and is currently performed by employees covered by the agreement or by employees covered by ILA craft agreements. Such a strike, respondents maintain, is specifically protected by the proviso clause of § 8(b) (4) (B),[7] which permits any primary strike where not otherwise unlawful. We agree with the Board that respondents' activities were proscribed by clause (B) of § 8(b) (4). As stated in N. L. R. B. v. Enterprise Assn. etc., 285 F.2d 642, at page 645 (C.A.2, 1960):[8] Respondents' argument, "is predicated upon a faulty and incomplete view of the controlling facts." The Board found that an object of respondents' conduct in inducing the strike was to effect a disruption of the business relations of all persons engaged in the transportation of meat to Transit Freeze until employees represented by ILA were employed to do the disputed work.
 
 
 9
 It cannot be gainsaid that the Act does not prohibit all strikes. Sand Door case, (Local 1976 United Brotherhood of Carpenters and Joiners of America, A. F. L. v. N. L. R. B.), 357 U.S. 93, 98-99, 78 S. Ct. 1011, 2 L.Ed.2d 1186 (1958). It outlaws only those strikes whose objects are proscribed by the Act. Clearly one of the objects here, if not the only one, was to require someone to hire employees represented by ILA to do the coopering and the transporting of the meat to the door of Transit Freeze. If Murphy was without power, under the circumstances, to assign that work or without authority to perform it, then respondents' actions were proscribed by § 8(b) (4) (B).
 
 
 10
 Responsibility for performing or hiring labor to perform the disputed work rested upon someone. The Board concluded that the Commissioners, not Norton or Murphy, had the authority to decide which contractor and hence, which group of employees would be permitted to do the work. Respondents claim that there is no provision in Tariff No. 13, requiring persons doing business with the Terminal to leave the handling of goods on the pier to the Commissioners. The right of the Commissioners to insist on such a condition precedent before one may transact business on the Terminal is well within the power granted by the Delaware Act of April 12, 1917, as amended, Revised Code of Del. (1935), Ch. 67, art. 3, § 2436 (§ 28). And item 60 under the rules and regulations of Tariff No. 13, we think, is sufficient notice to shippers, consignees and water carriers that they must make arrangements in advance with the Commissioners for the handling of cargo if they desire to transact business at the Terminal. Here, prior arrangements were made with the Commissioners by representatives of the consignee and the vessel owner.[9] Agents of the latter were told by the superintendent of the Terminal that their jurisdiction over the cargo would end when the longshoremen placed the cargo on pallets at the side of the vessel. Moock testified that this was the usual practice on the waterfront.
 
 
 11
 But even if we assume that Tariff No. 13 did not reveal that the Commissioners were exercising their power to take exclusive jurisdiction over goods on the Terminal, we cannot say that the Board's conclusion was not supported by substantial evidence on the whole record. The fact is that the Commissioners assumed they had the right to handle goods on the pier and told Murphy that they would take over when it placed the cargo of meat on pallets at the vessel's side. If they were wrong in doing so, the inducing or calling of a strike against Murphy was not the proper answer. Superior Derrick Corp. v. N. L. R. B., 273 F.2d 891, 893 (C.A.5, 1960, cert. denied sub nom. Seafarers' International Union of North America, etc., AFL-CIO, v. N. L. R. B., 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed. 2d 47; N. L. R. B. v. Plumbers Union of Nassau County, Local 457, etc., 299 F.2d 497, 501 (C.A.2, 1962). There was no showing that Murphy conspired with the Commissioners in order to circumvent the terms of the agreement between PM TA and Locals 1290, 1291, 1332 and 1694. Therefore, ILA and Local 1694's dispute was not with Murphy, the employer of the striking longshoremen, but with some other person. Moreover, the vessel owner did not have the primary obligation of paying for the coopering and the transporting of the meat from shipside to the consignee's freezer door. Its responsibility for the cargo ended when it delivered the meat to the terminal operator. The Board did not find the custom of the port to be otherwise, or that the Commissioners or the consignee complained that proper delivery was not made. See The Eddy, 5 Wall. 481, 27 U.S. 481, 18 L.Ed. 486 (1866); Constable v. National Steamship Co., 154 U.S. 51, 63, 14 S.Ct. 1062, 38 L.Ed. 903 (1894); North American Smelting Co. v. Moller S.S. Co., 204 F.2d 384 (C.A.3, 1953); Tan Hi v. United States, 94 F.Supp. 432 (N.D.Cal.1950). Also see Norjac Trading Corp. v. The Matilda Thorden, 173 F.Supp. 23, 28 (E. D.Pa.1959). The obligation of paying for the work in question fell upon either the consignee or the shipper, or in part upon the consignee and in part upon the shipper. As has been adverted to earlier, the consignee, Transit Freeze, had previously arranged with the Commissioners to have them supply all the labor and equipment which it might require from time to time. Norton was the agent for the vessel owner and not that of either the consignee or the shipper. Hence Murphy, who derived its power to unload the vessel from Norton, had no authority to mete out any phase of the disputed work.
 
 
 12
 The Board also found that respondents' activities were not within the protected area of primary striking in the proviso to clause (B). Such activities were clearly secondary.
 
 II.
 
 13
 As a second ground for the issuance of its order, the Board found that respondents' efforts to compel Murphy to adhere to certain provisions of the collective bargaining agreement between PMTA and Local 1694, previously set forth in this opinion, to be in violation of § 8(b) (4) (A). This particular section declares it to be an unfair labor practice for a labor organization or its agents to engage in or induce or encourage a strike where an object thereof is to force or require any employer "to enter into" any agreement which is prohibited by § 8(e),[10] 29 U.S. C.A. § 158(e).
 
 
 14
 Respondents argue that the provisions in the agreement are to regulate working conditions within an employer-employee orbit, and that therefore employees may, unless the contract otherwise provides, strike to enforce those conditions. The Board is willing to admit that § 8(e), if read literally, would make unenforceable and void any contractual provision containing a restriction on an employer's power to contract out work, for any such provision constitutes, in some measure, an agreement to cease or refrain from doing business with other persons. However, it does not agree that such a reading is proper. It concedes that a provision, voluntarily reached, may forbid contracting out work for purposes of preserving work and protecting certain working conditions and standards of employees within a particular bargaining unit. But it maintains that the provision in question[11] may be used to prevent contracting out work for purposes other than those stated above, and such other purposes are proscribed by § 8(e). Thus, the Board says, if Murphy had been successful in obtaining the work in question, employees in different bargaining units represented by locals other than 1694 would have been hired to do the work.[12]
 
 
 15
 Undaunted by the Board's answer to their argument, respondents maintain that since the agreement of December 23, 1959, between PMTA and Local 1694 and other locals had been in existence at the time the employees of Murphy went on strike, neither Norton nor Murphy were doing business with either the Commissioners or the owners of the S.S. Pipiriki on or about December 23, 1959. Therefore, § 8(b) (4) (A) is inapplicable, they claim, because they did not bring any pressure with an object of forcing or requiring PMTA or any of its members "to enter into" any agreement "to cease" doing business with any other person. They interpret the words "to enter into" to mean "to secure" or "to obtain"[13] and the words "to cease" as meaning "to interrupt" or "to discontinue", such as to terminate an existing relationship in contrast to the words "to refrain from" which indicates a refusal to renew or enter into a relationship which did not exist. The Board disagrees with respondents' interpretation and argues that the legislative history of the 1959 amendments to the Act buttresses its contention that where an object of the union or its agents is to enforce a provision in an agreement declared by § 8(e) to be unenforceable and void, the union's activities are proscribed by § 8(b) (4) (A) in that regard.
 
 
 16
 We do not deem it necessary under the circumstances to decide whether respondents' activities were proscribed by § 8(b) (4) (A). There was neither a claim nor proof that Murphy hired or attempted to hire employees other than those represented by Local 1694 to unload the vessel or that it conspired with anyone to circumvent the provisions of the agreement between PMTA and Local 1694.
 
 
 17
 Thus is cannot be validly argued that Murphy refused to abide by that part of the provision of the agreement which in substance provides that the employer "will not directly perform work done on a pier or terminal * * * unless such work on such pier or terminal is performed by employees covered by I.L. A. agreements." The kind of work meant is that type "which historically and regularly has been and currently is performed by employees covered by this agreement or employees covered by I.L.A. craft agreements."[14] In addition the Board has determined that Murphy was without power to contract out the controverted work and without authority to perform it. In other words, the contract provision in question could not have been brought into play legally against Murphy. The reliance of ILA and Local 1694 upon that provision as requiring Murphy to perform or subcontract it to employers who had contracts with ILA was misplaced. Respondents' inducing of the strike with an object of obtaining the work constituted an unfair labor practice under § 8(b) (4) (B), as the Board correctly found, irrespective of the provisions of any agreement between PMTA and Local 1694. The Board need have gone no further than that finding. We think the determination of whether § 8 (b) (4) (A) is applicable should await a factual situation where either the employer hires or attempts to hire employees represented by a union other than the one with which the employer has a contract, or the employer has or believes that he has the power to contract out work and attempts to do so in the face of a provision in a contract forbidding such action and the union is seeking to enforce that provision.
 
 
 18
 Accordingly, with the deletion of the words "to force or require Murphy-Cooke and Co., and/or Norton-Lilly and Company, Inc., to enter into an agreement proscribed by § 8(e) of the Act, or", appearing therein, the order of the Board will be enforced. A form of decree may be submitted, if in accordance with this judgment.
 
 
 
 Notes:
 
 
 [1]
 The Act creating the Board of Harbor Commissioners for the City of Wilmington, Delaware, and prescribing its powers and duties, in pertinent part, provides:
 "Section 1. * * * The Board shall construct, maintain and operate, and shall have and exercise full power and control over, said wharves, docks, piers, slips, harbors and warehouses, under such rules and regulations and provisons, as it, by resolution, may establish.
 "The Board of Harbor Commissioners shall also have the following powers:
 "(a) To make, adopt and enforce bylaws, rules and regulations, regarding the use and management of all municipal wharves, piers and docks, or other municipal water front property, including structures and appliances, and to collect and receive the income therefrom.
 * * * * *
 "(e) to lease any portion or portions of the land or facilities controlled by said Board, if it shall deem it to the advantage of the City so to do * * * subject, however, to the approval of The Council of the Mayor and Council of Wilmington."
 * * * * *
 See Act of April 12, 1917, 29 Del.Laws, Ch. 123, p. 369, as amended by Act of March 18, 1925, 34 Del.Laws, Ch. 122, p. 307, Revised Code of Del. (1935), Ch. 67, art. 3, § 2436 (§ 28).
 
 
 [2]
 Items 60 and 68 of the Rules and Regulations of Tariff No. 13, setting forth the rates, rules and regulations governing the conditions under which concerns must deal with the Terminal, provide in part:
 Item Subject RULES AND REGULATIONS

 * * * * * * * *

 When shippers, consignees, rail, motor freight or
 water carriers forward business to the Terminal,
 60 Arrangements for arrangements must be made in advance for the
 Handling Business handling or storage of same, otherwise it is optional
 and Use of the with the Board as to whether or not such business
 Facilities shall be accepted.

 The use of facilities under the jurisdiction of the
 Board shall constitute a consent to the terms and
 conditions of this tariff, and evidences an agreement
 on the part of all vessels, their owners or agents,
 and other users of such facilities to pay all charges
 specified in this tariff and be governed by all rules
 and regulations herein contained.

 * * * * * * * *

 All stevedoring (loading or discharging of vessels)
 will be subject to the rules and regulations of the
 68 Stevedoring Board and must be performed in a manner satisfactory
 to the Board, but the Board assumes no responsibility
 for such work, unless otherwise provided.

 * * * * * * * *

 This tariff cancelled Tariff No. 12 and Supplements.
 
 
 [3]
 See Footnote 2
 
 
 [4]
 Artificial Island is a filled in area on the Delaware River off Stoney Point, New Jersey; it is south of Wilmington, Delaware
 
 
 [5]
 Prior to the arrival of theS.S. Pipiriki in Wilmington, two ships loaded with cargoes of frozen meat had called at the Port, the S.S. Port Freemantle on December 16, 1957, and the S.S. Port Huron on December 29, 1958. There was evidence submitted to the N. L. R. B. that Terminal Service Co., which hired employees represented by ILA, did the coopering work for the meat taken from the S.S. Port Freemantle and supervised and delivered the cargo taken from the S.S. Port Huron. In addition, James T. Moock, vice-president of ILA, told the Board of Harbor Commissioners that members of ILA were performing that type of service in the ports of New York and Philadelphia.
 
 
 [6]
 Had Murphy been assigned to perform the work in dispute or employees represented by ILA been hired to do it, in all likelihood, part of the work would have been performed by members of Clerks & Checkers, Local 1242, and Ship Claimers & Coopers, Local 1566. Both of these locals were affiliated with ILA
 
 
 [7]
 This section provides in pertinent part:
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * handle or work on any goods * * * or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —
 * * * * *
 "(B) forcing or requiring any person to cease * * * handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;"
 
 
 [8]
 In this case the employees involved, relying on a work protection clause in the collective bargaining agreement, brought pressure on the employer for the asserted purpose of protecting their work. The Board found the pressure to be "secondary" in nature because the employer lacked power to give its employees the work which they believed to be rightfully theirs. The Court of Appeals agreed with the Board
 
 
 [9]
 The record is silent concerning the shipper; there is no proof that the vessel owner was acting as agent for the shipper
 
 
 [10]
 Subsection (e) of § 8 provides, in pertinent part: "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void * * *."
 
 
 [11]
 The Board reads this provision as prohibiting employer-members of the Association from subcontracting out certain work unless the subcontractor is under contract with ILA. The work meant is the kind "which historically and regularly has been and currently is performed by employees covered by this agreement [PMTA — Local 1694] or employees covered by ILA craft agreements". International Longshoremen's Association, AFL-CIO, et al., 137 N.L.R.B. 1178, 1186, n. 24. We cannot quarrel with this interpretation
 
 
 [12]
 The Court of Appeals for the District of Columbia has agreed with the Board that a provision in an agreement that permits "a concurrence between the union and the Association to boycott another employer for reasons not strictly germane to the economic integrity of the principal work unit" is proscribed by § 8(e). See District No. 9, I. A. M., AFL-CIO v. N. L. R. B., 114 U.S.App.D.C. 287, 315 F.2d 33, 36 (1962)
 
 
 [13]
 See Construction, P. & M. Laborers Union, Local 383, AFL-CIO, et al. v. N. L. R. B. et al., 323 F.2d 42, 426 (C.A.9, 1963)
 
 
 [14]
 However, the Board has interpreted this portion of the agreement to mean that the "Employer-members of the Association could not work on a pier where work historically and regularly performed by employees in the bargaining unit was being performed by employees not covered by ILA agreements." Then the Board went on to find that this provision is of the "hot cargo" type and efforts to enforce it are proscribed by § 8(e) of the Act. International Longshoremen's Association, AFL-CIO, et al., 137 N.L. R.B. 1178, 1182, n. 6. We think the Board's interpretation is a forced one