NATIONAL WOODWORK MANUFAC-
TURERS ASS'N et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

METROPOLITAN DISTRICT COUNCIL
OF PHILADELPHIA AND VICINITY
OF the UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, AFL–CIO, Respondent.

METROPOLITAN DISTRICT COUNCIL
OF PHILADELPHIA AND VICINITY
OF the UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 14904, 14988, 15064.

United States Court of Appeals
Seventh Circuit.

Nov. 17, 1965.

Rehearings Denied Jan. 24, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.

M. H. Goldstein, Philadelphia, Pa., for Metropolitan Dist. Council etc.

Charles B. Mahin, Chicago, Ill., for National Woodwork Manufacturers Ass'n.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Petitioner, National Woodwork Manufacturers Association, on behalf of its members, Hardwood Products Corporation, a Wisconsin corporation, and Mohawk Flush Doors, Inc., an Indiana corporation, herein called "NWMA", "Hardwood", and "Mohawk", respectively, asks us in No. 14904 to review and modify an order of the National Labor Relations Board, herein called the "Board", issued on November 12, 1964, dismissing, in part, a complaint against Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, et al., herein called the "Council" or the "Union".

In No. 14988, NWMA and Charles B. Mahin, an individual, made charges upon which the Board issued a complaint on August 27, 1963, and its amended complaint on October 4, 1963, alleging that respondent unions had engaged and were engaging in unfair labor practices in violation of section 8(b) (4) (A), section 8(b) (4) (B), and section 8(e) of the Labor Management Relations Act of 1947, as amended, herein called the "Act", 29 U.S.C.A. § 158. In No. 14988, the Board seeks enforcement of its order entered against the Council and its affiliated local unions.

In No. 15064, the Council, Robert L. Gray and Charles L. Boyer, by their petition, seek an order setting aside the order of the Board to the extent that it finds against them and imposes sanctions on them.

Following a hearing before an examiner and the filing of his decision, the Board issued the aforesaid order of November 12, 1964, which dismissed all charges of violations except those with respect to the Union's conduct on three construction jobs described as (1) the Coatesville Hospital job, at which L. F. Driscoll Company was general contractor; (2) the North Junior High School job, at which John J. McDonnell, Inc., was general contractor; and (3) the St. Aloysius Academy job, at which Nason & Cullen, Inc., was general contractor; as to each of which the Board found violations of section 8(b) (4) (B) but granted what NWMA considers only partial and inadequate relief.

Twenty-seven local carpenter unions in Philadelphia and in four other counties in Pennsylvania are affiliated with the Metropolitan District Council of Philadelphia and Vicinity. These locals are "serviced" by 11 business agents who work directly under Gray, the Council's secretary-treasurer and business manager. These business agents police the jobs and see that contracts are adhered to.

The Council engages in collective bargaining with individual employers and with the General Building Contractors' Association, Inc., (GBCA) which bargains on behalf of its employer members who build schools, hospitals, factories, and other structures in the Philadelphia area. The contracts in effect during the relevant period contain a provision similar to rule 17 of the Union's bylaws, which reads as follows:

> Rule 17. No employee shall work on any job on which cabinet work, fixtures, millwork, sash, doors, trim or other detailed millwork is used unless the same is Union-made and bears the Union Label of the United Brotherhood of Carpenters and Joiners of America.[1] *No member of this District Council will handle material coming from a mill where cutting out and fitting has been done for butts, locks, letter plates, or hardware of any description, nor any*

---

1. The first sentence in Rule 17 concededly violates section 8(e) but no issue is presented here concerning that aspect of the case.

*doors or transoms which have been fitted prior to being furnished on job, including base, chair, rail, picture moulding, which has been previously fitted. This section to exempt partition work furnished in sections.* (Emphasis added.)

It is petitioner's contention in No. 14904 that the Union engaged in an unlawful product boycott of prefabricated doors in the Philadelphia area and enforced an illegal hot-cargo contract prohibiting the use of such prefabricated doors [2] throughout said area.

Prefabricated doors are doors which are machined, processed and finished in various ways at the plants where they are manufactured. There was testimony that the use of prefabricated doors saves time and money.

Petitioner cites, as a matter of common knowledge, that the use of prefabricated doors has been greatly increasing in the construction industry, which extends to numerous other parts of building, such as windows, factory-built trusses, wall and partition assemblies, prefinished paneling, prefabricated kitchens and bathrooms, and on up to the point of prefabricated houses and other buildings.

Prior to the present proceedings a letter was written in February, 1963, by Business Manager Gray of the Council to President Hutchinson of the United Brotherhood of Carpenters, stating that there was a serious problem of precut and prefitted doors coming into the Philadelphia area. Then followed a union drive to bar all prefabricated doors, which was implemented by the alleged boycotts and work stoppages that led to the NWMA charges against the Union and these proceedings.

Typical of the operation of the Union drive in this respect was the Coatesville Hospital job in May 1963. Driscoll, the contractor, purchased through a Pennsylvania millwork distributor, prefabricated architectural doors made by Hardwood for this job. In accordance with the architect's common practice, the specifications called for precut, prefitted and prefinished doors. On May 23, the day after the doors were delivered to the job, Union agent Boyer called from the job and told vice-president Brown of Driscoll that the prefinished doors could not be hung, because it was "in violation of an agreement". When Brown asked "where do we go from here?", Boyer said that he did not know and that if the doors were hung anyhow, the job would be "struck". Boyer admitted that his word was not final and that Brown could take it up with Gray. Brown then called Gray and stated what had occurred, but Gray said that "no carpenters from now on will hang pre-finished or pre-fit doors." Brown asked what could be done, because the hospital was hoping to get into the building, and Gray said that was not his problem. Thereupon Driscoll's secretary telephoned Gray and asked for an explanation and was told that Driscoll was in violation of rule 17 because the doors had been factory precut, and that the carpenters were not allowed to hang them. From May 23, when the Union carpenters discovered the doors on the job, until May 27, they refused to hang them. They were then hung after the contractor agreed to pay the carpenters for work which they did not perform.

2.  (1) Prefitted doors which have been cut to exact size and beveled at the factory, so that they will fit into frame openings on the job without further machining.
     (2) Precut doors which have been machined at the factory to receive hardware (locks, knobs, hinges, etc.), louvers, glass openings, and the like.
     (3) Prefinished doors which have been perservative-treated, sealed, varnished, painted, or otherwise finished at the factory for ultimate use without further finishing. (Such doors must be completely machined before the final finish is affixed at the factory.)
     (4) Armored doors which are completely machined at the factory and have plastic or other wear-resistant materials laminated to surfaces and edges.
     (5) Prehung doors which are completely machined and assembled in door-frame units at the factory.

Such a solution was not reached in the North Junior High School, St. Aloysius Academy or Frouge Corporation jobs, the first two of which are factually not different from the Coatesville Hospital job.

Frouge Corporation was the general contractor on a housing project in Philadelphia, for which it ordered factory-machined Mohawk doors. Neither job specifications nor Frouge's contract required that the doors be precut, prefitted, or premachined. When the second shipment thereof arrived, Union agents did not allow their men to work on them. They cited rule 17 which was then shown to and read by President Frouge and Project Manager Green. Frouge had Green order 665 Mohawk doors, which, when delivered, did not bear a union label. Union carpenters did the cutting on the replacement doors which were then installed on the job.

The Board held that the Union violated § 8(b) (4) (i) (ii) (B), by reason of its boycott of prefabricated doors on the Coatesville, North Junior High and St. Aloysius jobs, but as to Frouge, it held otherwise, giving as its reason, that, while in the first three jobs the specifications called for prefabricated doors and hence the Union target was the doors and persons making and distributing them, in Frouge the Union boycotted prefabricated doors which had been purchased by the contractor—but which were *not required* by job specifications. This conclusion seems to indicate that the Board held that the Union's target in Frouge was not the prefabricated doors and their manufacturer but rather contractor Frouge and that the situation involved only a primary dispute with him. We agree.

Section 8(b) (4) (i) (ii) (B) reads as follows:

(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * * *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * *. *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, *any primary strike or primary picketing* [emphasis supplied] * * *.

We hold that Frouge was the object of a "primary strike or primary picketing" and therefore the Union was entitled to the protection of the proviso in § 8(b) (4) (B).

We now consider the objections of the Union to the Board's finding of violations of § 8(b) (4) (B) as to the first three contractors above-named.

The language of the statute and its legislative history clearly indicate that § 8(b) (4) (B) applies to the product boycott carried on by the Union in this case under its rule 17. In Allen Bradley Co. v. Local Union No. 3, etc., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), it appeared that Local 3 of the Electrical Workers Union and the Electrical Contractors of New York City had agreed on work rule restrictions, under which Local 3 refused to handle or install electrical fixtures and equipment made or assembled outside the New York City area. It was agreed that, in lieu of absolute prohibition, the union would dis-

598

mantle and rebuild the "foreign" equipment or be paid the equivalent thereof. Local 3 had no active labor dispute with the "foreign" manufacturers, nor did it have any interest in the working conditions at such factories. It was not concerned with whether the "foreign" fixtures were union made—in fact, it barred fixtures made by its sister local union in New Jersey. Further, Local 3 was not concerned with whether the immediate contractor had or did not have "control of the work." Clearly, the union's ultimate objective was to preserve work for its members. The intermediate objective, as the means to its ultimate goal, was the boycott of foreign products. It was the inadequacy of antitrust remedies, demonstrated in Allen Bradley, supra, that led directly to the Taft-Hartley prohibition of secondary boycotts.[3]

Our own court in Joliet Contractors Association v. National Labor Relations Board, 202 F.2d 606 (1953), cert. den. 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349, considered an area boycott similar to that in Allen Bradley. It was a typical product boycott case. There Glazier's Union Local 27 had a rule that preglazed window sashes could not be installed, and the union's bylaws and agreements with the contractor provided that all sash and glass work must be done on each respective job site or building. We rejected the argument there made that the union's dispute with the contractor was only primary and that its objective was preservation of work on the job, saying, at 202 F.2d 610:

" * * * the fact remains that the target was the use of preglazed sash, and any and all who handled, used or sold such sash were the intended and in many cases the actual victims of the Union's course. Moreover, we are not convinced that a Union violation of the provision

under discussion is dependent upon whether its activities are primary or secondary. * * * "

In the case at bar the Union's target was and is prefabricated doors. Neither here nor in Joliet Contractors was there a labor dispute between the union and any manufacturer.[4] In Joliet Contractors we found the union's refusal to install such products to be a violation of § 8(b) (4) (A).[5] At that time the proviso in § 8(b) (4) (B) had not been enacted.

We find nothing to the contrary in Local 761, International Union of Electrical, Radio & Machine Workers, AFL–CIO v. National Labor Relations Board, et al., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed. 2d 592 (1961), relied on in the brief of the Union.

Our views find support in National Labor Relations Board v. Local 11, United Brotherhood of Carpenters, etc., 6 Cir., 242 F.2d 932 (1957) which involved § 8(b) (4) (A) [6] of the Act. The Board there contended that the carpenters' union induced a concerted refusal by the employees of the subcontractors to handle prehung doors in a building project in Ohio, which doors had been manufactured in Indiana and Michigan and were sold as component parts of prefabricated home units to the general contractor in the Cleveland, Ohio area.

Judge Stewart (now Justice Stewart) said at 934:

"Substantially adopting the Trial Examiner's Intermediate Report, a majority of the Board found the respondents had induced and encouraged employees of the subcontractors to engage in a concerted refusal to handle the prehung doors, and that objectives of the respondents' conduct were to force or require the subcontractors to cease using pre-

3. Legislative History of the Labor Management Relations Act, 1947, pp. 1055–1056, 93 Cong.Rec. 4255.

4. As in Allen Bradley, in the case at bar the Union was not concerned with whether the boycotted doors were union made.

5. Now known as (B).

6. Now known as (B).

hung doors, to force or require Erie Building Company to cease using and purchasing prehung doors, and to force or *require Scholz Homes, Inc., to cease doing business with the manufacturers of the doors.* (Italics supplied.)

\* \* \* \* \* \*

"The fact that there was not an active labor dispute between the respondents and the producers of the doors would not serve to immunize the respondents from the terms of § 8(b) (4) (A) of the Act, which neither literally nor implicitly requires the existence of such a dispute as a condition of its operation. N. R. L. B. [sic] v. Washington-Oregon Shingle Weavers' Dist. Council, 9 Cir., 1954, 211 F.2d 149, 152–153.

\* \* \* \* \* \*

"This brings us to the respondents' primary defense. They say that even if they encouraged and induced a concerted work stoppage by employees with respect to the doors, this did not constitute an unfair labor practice within the meaning of § 8(b) (4) (A) because the immediate employers (the subcontractors) had acquiesced in advance in the employees' action by virtue of a collective bargaining agreement containing a 'hot cargo' clause, and also by reason of the fact that the subcontractors themslves [sic] belonged to the union, and as union members were obligated not to use the prehung doors. Although the Board found upon conflicting evidence that no collective bargaining agreement containing a 'hot cargo' clause was then in effect, it is conceded that the subcontractors were members of the union and that they acquiesced in the conduct of their employees in not handling or working on the doors in question."

By an amendment enacted in 1959, subsection (e) was added to § 8 of the Act, 29 U.S.C.A. § 158, providing, in part:

> (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: \* \*.

The distinction between job site work and factory-made products is recognized in the foregoing construction proviso of § 8(e) itself. The legislative history shows that it was explained by Senator Kennedy that the "proviso does not cover boycotts of goods manufactured in an industrial plant for installation at the jobsite."[7]

We hold that § 8(e) unaffected by the proviso is controlling in this case.

For all of these reasons, that part of the Board's order entered November 12, 1964 dismissing, in part, the complaint against the Council is set aside and this cause is remanded to the Board with instructions to enter an order finding that the Council violated § 8(b) (4) (i) (ii) (A) and § 8(e) of the Act, as set forth herein, as well as § 8(b) (4) (i) (ii) (B) to the extent found by the Board, which action we affirm.

7. J.A. 135; II Leg.Hist., p. 1443.

The Board is directed to restrain any further such proscribed violations of the Act by the Council in the Philadelphia area.

In part affirmed and in part set aside and remanded with directions.