**LOCAL NO. 433, UNITED BROTHER-HOOD OF CARPENTERS AND JOIN-ERS OF AMERICA, AFL–CIO, Petition-er,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 73–1348.

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1974.

Decided Nov. 22, 1974.

Bernard M. Mamet, Chicago, Ill., for petitioner.

David Fleischer, Atty., N. L. R. B. for respondent. John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., N. L. R. B., were on the brief for respondent.

Before HASTIE,* United States Senior Circuit Judge for the Third Circuit, and ROBB and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

These petitions invoke our jurisdiction under sections 10(e) and (f) of the National Labor Relations Act of 1947.[1] At issue is an order of the National Labor Relations Board, issued 8 March 1973, finding the Carpenters Union in violation of section 8(b)(4)(B) of the Act.[2] For the reasons set out below, the petition to set aside the Board's order is

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 29 U.S.C. §§ 160(e) and (f).
2. 29 U.S.C. § 158(b)(4)(B).

granted; the Board's cross-petition for enforcement of that order is denied.

## I. BACKGROUND

On 1 February 1972 Bauer Brothers Construction Co., Inc., a general contractor, began construction on the addition of five floors to the existing St. Elizabeth Hospital in Belleville, Illinois. Bauer and the Carpenters Union[3] were bound by a collective bargaining agreement between Southern Illinois Builders Association ("SIBA"), of which Bauer was a member, and Tri-Counties Illinois District Council of Carpenters, with which the Carpenters were affiliated. The agreement covered work of all branches of the carpentry trade, including "milling, fashioning, joining, assembling, erecting, fastening or dismantling of all materials of wood, plastic, metal, fiber, cork and composition, *and all substituting materials.*"[4] It also provided that such unit work was to be performed only by employees of the bargaining unit.[5] Moreover, the agreement contained a clause which purported to regulate subcontracting of unit work by Bauer.[6]

Bauer entered into a written subcontract on 8 March with Lippert Brick Contracting, Inc., under which Lippert was to perform all masonry work on the project.[7] The dispute underlying the instant petitions centered around the task of laying haydite filler blocks used in the formation of concrete floor joists.[8] The disputed task was eventually performed by Lippert bricklayers.

Early in April, Alfred Kraft, the Carpenters' business agent, and Norbert Wolf, Bauer's construction superintendent, engaged in several discussions concerning the proposed use of lightweight filler blocks as a substitute for the metal or wooden formwork traditionally used in concrete joist floor construction. During the first discussion, when Kraft inquired as to the type of filler material to be used, Wolf answered that part of the work had been subcontracted to Lippert, and that depending upon the terms of that subcontract, it might create a problem for the Carpenters. When, in the second discussion, Wolf again men-

---

3. United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Local No. 433.

4. App. at 5 (emphasis added). References to the record will hereafter be cited as follows: "App." refers to the appendix to the parties' briefs; "Supp." refers to the supplemental appendix.

5. App. at 6.

6. Article VII, section 4 provided:
   Subcontracting—Unit Work. The territorial and occupational jurisdiction of the Union, as stated in this Agreement, shall be recognized to the end that the EMPLOYER shall not subcontract or contract out such work nor utilize on the job site the services of any other person, company, or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the employees covered by this Agreement.

7. Lippert was not bound in any way by labor agreement with the Carpenters.

8. In normal concrete floor joist construction a temporary plywood deck is built to support formwork which in turn receives the concrete pour. Creation of the joists is achieved by fashioning a corrugated-like formwork surface into which concrete is poured. Traditionally, carpenters have been employed to build the formwork by fastening metal or wooden pans to the temporary plywood deck prior to the concrete pour. Thereafter, once the concrete is poured and has hardened, the plywood deck having served its limited purpose is dismantled and the metal or wooden pans removed from the underside of the new floor exposing the concrete joists. A recent innovation, however, substitutes lightweight haydite filler blocks for the metal or wooden pans. The new procedure involves measuring and striking guidelines, fastening metal bands to the plywood deck, laying out the blocks and then securing them to the metal bands. The only significant difference between this type of construction and the traditional method is that unlike the metal or wooden pans, the haydite blocks—although they serve the same purpose and contribute no structural support to the concrete—remain embedded in the concrete after it has hardened and the plywood deck has been removed.

tioned the problem, Kraft stated his view that the block-laying was properly Carpenters' work since the filler block was taking the place of "something like a pan deck." [9] Wolf suggested that since Bauer had subcontracted the work and therefore had no control over the block-laying assignment, Kraft should talk to Lippert, the subcontractor in charge of the filler blocks. Later, when Kraft met with Wolf and Bauer project manager Weiss and stated that carpenters had been employed to lay haydite blocks on a similar construction project in Springfield, Illinois, Weiss acknowledged that he "maybe made a mistake." [10] Wolf suggested a meeting to resolve the problem.

At Bauer's request, SIBA called Bauer and the Carpenters to a meeting but did not inform the Carpenters that Lippert and the Bricklayers' business agent had also been invited to attend. At the meeting, held on 4 May, Lippert stated that his men would lay the blocks and the Carpenters would strike the lines, nail the metal bands to the temporary deck, and band the blocks into place. Kraft, the Carpenter Representative, saw this proposal as a problem and referred to the use of carpenters to lay out the blocks on the Springfield construction site. The meeting adjourned without a solution.

Construction progressed until 24 May, by which time the deck had been built, lines had been partially struck, and some of the metal bands had been nailed to the deck. But when Lippert bricklayers began to lay out the blocks, Elmer Hassenbrock, the Carpenters' shop steward, complained to Wolf, Bauer's construction superintendent, that the Carpenters would not work on the same deck where bricklayers were doing carpenters' work. At Wolf's direction, Lippert asked Hassenbrock what the problem was and Hassenbrock repeated that the Carpenters would not work alongside the bricklayers. Lippert replied, "Well, that is fine . . . we will do it all." [11]

The Carpenters were offered other work by Wolf, but Hassenbrock informed him at noon that the Carpenters would walk out. On 25 May Lippert filed an unfair labor practice complaint with the National Labor Relations Board alleging a violation by the Carpenters Union of section 8(b)(4)(B) of the National Labor Relations Act of 1947.[12] The Administrative Law Judge found that the Carpenters had not violated section 8(b)(4)(B), but the Board reversed and found that the strike was secondary and in violation of the Act.

The Carpenters Union filed the instant petition for review, and the Board cross-petitioned for enforcement of its order.

---

9. Supp. at 6.

10. Ibid.

11. Supp. at 8.

12. 29 U.S.C. § 158(b)(4)(B) provides:
It shall be an unfair labor practice for a labor organization or its agents . . . .
(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . .
forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

## II. INTERPRETATIONS OF SECTION 8(b)(4)(B)

In NLRB v. Denver Building Council,[13] the Supreme Court noted that Section 8(b)(4)(B) incorporates the "dual congressional objectives of preserving the rights of labor organizations to bring pressure to bear on offending employers in *primary labor disputes* and of shielding unoffending employers and others from pressures *in controversies not their own.*"[14] As the Court stated some years later in National Woodwork Manufacturers Ass'n v. NLRB,[15] striking the delicate balance between these twin objectives requires "an inquiry into whether, under all the surrounding circumstances, the Union's objective was *preservation of work* for [the unit] employees, or whether the . . . boycott [was] tactically calculated to *satisfy union objectives elsewhere.*"[16]

Prior to the *National Woodwork* decision, the Board's application of a "right to control" test in distinguishing between primary and secondary activity received broad acceptance in the Courts of Appeals.[17] Post-*National Woodwork* courts, however, have concluded that that decision restricts application of the test.[18]

But whether we examine the totality of the circumstances or apply a nearly *per se* right to control test, in which direction the Board seems inclined in some cases, we think the Board is wrong on the facts before us. At the center of the labor dispute in *National Woodwork* was a contractual restriction precluding the employer from subcontracting work which had been traditionally performed by his own employees and which he, being in position to make such assignment, had unilaterally altered. Thus the boycott in *National Woodwork* did not extend "to satisfy-[ing] union objectives elsewhere."[19] We think the plain meaning of *National Woodwork* is that the legitimate aim of a work preservation clause is simply to cause an employer to retain work traditionally done by his employees.

## III. THE PARTIES TO THE DISPUTE

Article VII, section 4, Subcontracting—Unit Work[20] was a straightforward work preservation clause seeking to insure that all work of the defined type undertaken by Bauer would be performed by the Carpenters Union, or, if subcontracted out, would be done in accordance with the same or higher

13. 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

14. *Id.* at 692, 71 S.Ct. at 953 (emphasis added).

15. 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (emphasis added).

16. *Id.* at 644, 87 S.Ct. at 1269.

17. The test was approved either explicitly or implicitly in seven circuits, including this one. Local 5, United Ass'n of Journeymen v. NLRB, 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963) ; American Boiler Mfrs. Ass'n v. NLRB, 366 F.2d 815 (8th Cir. 1966) ; National Woodwork Mfrs. Ass'n v. NLRB, 354 F.2d 594 (7th Cir. 1965) ; United Bhd. of Carpenters and Joiners v. NLRB, 339 F.2d 142 (6th Cir. 1964) ; NLRB v. Longshoremen's Local 1694, 331 F.2d 712 (3rd Cir. 1964) ; NLRB v. Enter-

prise Ass'n, Local 638, 285 F.2d 642 (2nd Cir. 1960).

18. *See* Local 742, Carpenters and Joiners v. NLRB, 144 U.S.App.D.C. 20, 444 F.2d 895, cert. denied, 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971) ; Plumber's Local Union No. 636 v. NLRB, 139 U.S.App.D.C. 165, 430 F.2d 906 (1970) ; Western Monolithics Concrete Products, Inc. v. NLRB, 446 F.2d 522 (9th Cir. 1971) ; American Boiler Mfrs. Ass'n v. NLRB, 404 F.2d 556 (8th Cir. 1968) ; NLRB v. Local 164, IBEW, 388 F.2d 105 (3rd Cir. 1968) ; Beacon Castle Square Building Corp. v. NLRB, 406 F.2d 188 (1st Cir. 1969). *But see* George Koch Sons, Inc. v. NLRB, 490 F.2d 323 (4th Cir. 1973). This and related issues currently await our *en banc* consideration in Enterprise Ass'n, Local 638 v. NLRB, No. 73–1764.

19. Note 15, *supra.*

20. Note 6, *supra.*

standards of pay and other benefits that the Carpenters had contracted for. (*See* Part IV, *infra*.) Having agreed to this, Bauer was under an obligation to live up to it, *i. e.*, to give the defined work to this Carpenters Local or, if subcontracted out, to workers with equivalent standards.[21] Any dispute over whether Bauer was living up to the contract would seem to be a dispute with the other party to that contract, *i. e.*, the Carpenters Local. To put it in the context of this case, the Carpenters Local would naturally look to Bauer for enforcement of the contract clause, for it was Bauer with whom the Carpenters had made the contract.

Apparently the Board did not grasp this basic relationship between Bauer and the Carpenters, for the Board's conclusions rest on the notion that Bauer was a *neutral* employer caught in the Carpenters' *primary* dispute with Lippert. This mistaken notion rests in turn upon two slender evidentiary reeds gleaned from the Administrative Law Judge's findings. In accordance with our duty under Universal Camera Corp. v. NLRB [22] to determine upon an examination of the entire record whether the evidence supporting the order below is substantial, we have determined that our consideration of the evidence, aside from the original fundamental contractual position of the parties discussed above,

compels the conclusion that the Carpenters' only dispute concerned the preservation of unit work and was with Bauer, not with Lippert.

The meager evidence upon which the Board relies to support its determination that the Carpenters' dispute was with Lippert is (1) the four-sided meeting of 4 May called by SIBA and attended by Bauer, the Carpenters, Lippert, and the Bricklayers; and (2) a remark made by Hassenbrock (the Union Steward) to Lippert during a fortuitous meeting in the Bauer construction trailer. Standing alone, this evidence might support the inference that the Board suggests.[23] But when weighed against the overwhelming evidence to the contrary, any such inference disappears.

■ Until the meeting of 4 May, the record contains no evidence that Lippert was involved in any discussions with the Carpenters or that the two had any contact at all regarding the disputed work. The record does indicate, however, that Kraft (Carpenters' representative) met with Wolf (Bauer's superintendent) on three occasions to discuss the matter, Wolf suggested that Kraft take the matter up with Lippert. Kraft apparently declined the suggestion and did not actually discuss the issue with or even in the presence of any Lippert representative until the meeting of 4 May, which

---

21. Although Bauer may not have had a "right to control" assignment of the disputed task, it had contracted with the Carpenters to retain such control for their benefit.

22. 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We are obliged to set aside the decision below if we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* at 488, 71 S.Ct. at 465.

23. Inasmuch as the Carpenters were unaware that Bauer had suggested that Lippert be invited to attend, no adverse inference can be drawn from the mere fact that Kraft and the Lippert representative were present at the same meeting. Moreover, it cannot be seriously contended that Kraft's

remarks that day, made in response to Lippert's question, indicate a dispute with Lippert. Kraft merely reiterated, as he had done before to Wolf and Weiss, his position that the block was a substitute material and should therefore be laid by Carpenters.

Lippert testified that Hassenbrock "felt that this Haydite block was his work and other carpenters kind of said they agreed with that and that they were going to go off the job until *we* gave it to them." Supp. at 17–18 (emphasis added). Unlike the Board, we decline to attach much significance to this remark. Instead, we find plausible the Carpenters' explanation that the remark was directed to Wolf, who was also present. It is also significant to note that this offhand remark was apparently made after the Carpenters had already made the decision to strike Bauer. *See* Supp. at 17.

had been called by SIBA at Bauer's request. Later it was Wolf who suggested to Lippert that he talk to Hassenbrock when it became apparent that a walk-out was imminent.

No formal meeting to discuss the problem was ever held between the Carpenters and Lippert. Lippert had a chance encounter with Hassenbrock in the construction trailer, asked what the problem was, and received the Carpenters' short answer.

In sum, we conclude that instead of substantial evidence supporting the conclusion that the dispute was between the Carpenters and Lippert, we find in the record evidence demonstrating that the dispute was with Bauer all along, and that any attempts to enmesh Lippert in the dispute were made by Bauer's representatives.

## IV. THE SUBSTANCE OF THE DISPUTE

The labor agreement by which Bauer and the Carpenters were bound contained a subcontracting clause [24] which, because it was "germane to the economic integrity of the principal work unit." [25] and sought "to protect and preserve the work and standards . . . bargained for,"[26] we characterize as a "union standards" clause, primary in

nature.[27] The work unit was defined to include "assembling [and] erecting . . . all materials of wood, plastic, metal, fiber, cork and composition, *and all substituting materials.*" [28] From the very outset of the controversy, Kraft maintained that since the haydite blocks were to take the place of "something like a pan deck," [29] the task of laying them belonged to the Carpenters. The Administrative Law Judge agreed and held that at the core of the dispute was "a legitimate question of interpretation of the existing labor agreement . . . for the purpose of preserving work which was 'clearly claimable' " thereunder by the Carpenters.[30]

The Board argues that the contract did not prohibit subcontracting of unit work, pointing out that unit work had been sublet in the past without any disagreement among the parties. This of course begs the question lying at the very heart of the clause, for there is no evidence that any subcontracts had been awarded to employers who *refused to recognize union standards.* The only reasonable conclusion, therefore, is that other unit work had been let to subcontractors who recognized union standards.

However, regardless whether the clause imposed an absolute ban on subcontracting of unit work, or only sought to limit subcontracting to employers

24. Note 6, *supra.*

25. Machinists Union v. NLRB, 114 U.S.App. D.C. 287, 290, 315 F.2d 33, 36 (1962).

26. Retail Clerks, Local 770 v. NLRB, 111 U. S.App.D.C. 246, 252, 296 F.2d 368, 374 (1961).

27. We upheld the validity of a similar clause in Truck Drivers Local 413 v. NLRB, 118 U.S.App.D.C. 149, 334 F.2d 539 (1964), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed. 2d 186 (1964), and there distinguished between a "union standards" clause and a "union signatory" clause.

28. Note 4, *supra.*

29. Note 9, *supra.*

30. Supp. at 12. The Administrative Law Judge reasoned that "[t]raditionally carpenters have fastened metal or wooden pans to the plywood deck prior to the [concrete]

pour for exactly the same purposes" that the haydite filler blocks were to be used. *Id.* at 12. The haydite blocks thus constituted merely a "substituting material" within the meaning of the labor agreement. The Administrative Law Judge concluded that the strike was therefore addressed to the labor relations of Bauer *vis à vis* his own employees and as such was primary and not in violation of section 8(b)(4)(B).

Having erroneously characterized Bauer as a "neutral" employer in a dispute between the Carpenters and Lippert, the Board avoided the crucial issue whether the haydite blocks were a substituting material and thus constituted clearly claimable unit work. We agree with the well-reasoned conclusion of the Administrative Law Judge, however, that the disputed task was clearly claimable and that the strike was addressed to the labor relations on Bauer *vis à vis* the Carpenters.

honoring union standards,[31] if the clause meant anything at all, it was clearly breached by Bauer in this case. Its very purpose, we believe, was to prevent just such an occurrence as that which led to the instant dispute, i. e., where a general contractor places beyond his reach the power to make unit work assignments.[32] Through the clause the Carpenters sought to protect against having to bargain for the assignment of unit work with a subcontractor, such as Lippert, with whom they were not bound by labor agreement. We perceive Bauer's responsibility under the agreement to have been to (a) insure that unit work, if sublet at all, was only awarded to employers who would honor Carpenter Union standards, or (b) refrain from subcontracting unit work *in toto*. Having sublet the work at issue, Bauer's duty was then to insure that Lippert complied with union standards. When Wolf first became aware of a potential dispute over laying the haydite blocks, he misconceived Bauer's responsibility under the labor agreement. The ensuing strike was in protest over a breach thereof and an effort to preserve unit work. The Carpenters having no duty to negotiate with Lippert, when it appeared that Bauer would not meet his responsibility under the agreement, the Carpenters struck. We find nothing unlawful in that conduct.

## V.  CONCLUSION

The conclusions of the Administrative Law Judge are amply supported by evidence in the record. To the extent that the findings and conclusions of the Board are inconsistent therewith, they are not supported by substantial evidence. Accordingly, the order of the Board here under review is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

So ordered.

---

31. A strict grammatical reading of the clause indicates (1) an absolute ban on *subcontracting* of unit work, and (2) a proscription against *utilizing* "the services of any other person, company, or concern to perform [unit] work that does not observe" union standards. Since we conclude that Bauer breached this aspect of the agreement in either event, we need not decide whether such a fine distinction was intended by the draftsman of the clause.

32. Wolf (Bauer) told Kraft (Union) on at least two occasions that he had "no control" over who would do the work. But we think the subcontracting clause obligated Bauer to retain control to the extent of insuring that the work was done by Carpenters Union standards, even if not performed by this particular local.

This case is thus distinguishable from *Local 742, Carpenters and Joiners*, (note 17, supra) in which the Hospital Association itself preserved its right to require the use of pre-machined doors throughout the project, and Simmons, the contractor, never had the "right to control" that aspect of the construction. Hence, we hold in this case (notes 16–18 and accompanying text) that on either the "right to control" test, or under the totality of the circumstances, the Board is in error.